Good morning, Your Honors, and may it please the Court, Arielle Volpe on behalf of Petitioner Ricky Patterson. By the State's own admission, we'll probably never know what happened to Derrick Prout. The State's main theory at trial was that Mr. Patterson did not have enough money to buy drugs from Prout, so he lured Prout to his home, stabbed a man who weighed 80 pounds more than him without incurring a single scratch, and waited five days to burn his body in a remote location north of Chicago while he was in St. Louis with his family. But we know that the jury had doubts about this theory because it sent a note asking whether the accountability instruction meant Mr. Patterson actually participated in the crime. Indeed, even the District Court acknowledged that a reasonable juror could find Mr. Patterson not guilty for being a principal. Had Mr. Patterson's trial attorney provided even the bare minimum constitutionally required performance, the jury would have concluded that Mr. Patterson was entirely unconnected to Prout's murder. Specifically— Well, what about the blood evidence in his house? Yes, Your Honor. So, the first—the investigators did recover blood, and according to the first analyst that testified at trial, that blood matched Prout's. However, that sample was run on less than 13 alleles, which scientifically couldn't have produced a match. There was a retest that was run on a proper sample, but according to Mr. Patterson's expert, there could have been cross-contamination with that sample, so there's reason to If there's cross-contamination, then there would just be no match, right? It wouldn't match the defendant. It would—it still—if there was cross-contamination because the samples were run on the same plate, it could produce a match, according to the scientific expert that would have matched the victim, Prout. But even assuming that Prout's blood was found in Mr. Patterson's house, that doesn't prove that Mr. Patterson killed Prout. There was no eyewitness placing Mr. Patterson with Prout, and in fact, the medical examiner couldn't even say when Prout was killed. It could have been as late as June 21st, after the fire. And so, just because there was blood found at Mr. Patterson's house does not mean that Mr. Patterson killed Prout. And indeed, there's reason to doubt that because of the new evidence that Mr. Patterson produced. The jury would have heard, again, had counsel provided constitutionally required performance, that Prout was a drug dealer who was in debt to other drug dealers from California or Indiana, that Prout and his wife had received threats because of his debts, that another drug dealer with whom Prout was in a partnership with knew intimate details of his death before the autopsy was performed or before it was released, that Prout had spoken of a group of killers from Indiana or California that would throw you in the trunk of your car and light it on fire, which is precisely how Prout was found. And the jury would have also heard that Mr. Patterson was physically incapable of overpowering a man 80 pounds heavier than him and stabbing him eight times. And having heard all this, an already doubtful jury would have had reasonable doubt. And again, let's start with what the state didn't show at trial. There was no motive for Mr. Patterson to commit the murder, and there was no concrete... There was a financial motive. Well, the state's theory... He stole the drugs. Correct, Your Honor. That was the state's theory at trial, but there was no evidence that Prout and Mr. Patterson had engaged in prior drug transactions and no reason to believe that Mr. Patterson would have committed murder for $16,000 worth of drugs. There was no evidence of animosity between the two men. There were no signs of a struggle. When Mr. Patterson showed up at his home after the fire, an investigator specifically noted that there were no scratches on him, that there was no sign of a struggle in the house, there was no blood spatter on the walls, there were no bullets recovered, there was no blood found on the blanket that was wrapped around Prout, there was no phone records or patterns suggesting that Mr. Patterson had plotted to kill Prout with other drug dealers. And despite acknowledging that Mr. Patterson likely did not act alone, the state never that the accomplice shared with Mr. Prout. Merely the state's case was just guesswork, but jurors needed to find Mr. Patterson guilty beyond a reasonable doubt, and there was a lot to doubt for the reasons that I just mentioned. Well, it was far more than guesswork. The phone evidence is very strong circumstantial evidence when matched with or paired with the blood evidence at the scene of the fire at your client's home. Respectfully, Your Honor, the only thing the phone evidence shows is that Mr. Patterson might not have been where he said he was. But it doesn't show that Mr. Patterson was with Prout. It doesn't show that he murdered Prout. It shows that, you know... It shows his proximity to where the body was found. Are you specifically speaking of the Lake County on June 20th? Yes. Yes, but even that's, that is on the way, again, it's just north of Chicago, and there are lots of reasons why Mr. Patterson could have been driving the cell phone towers only paying 10 miles. That's quite a large mile range, and that presumes that Mr. Patterson dropped the body off and then waited an additional two days to burn it. There's no reason why he would have done so. What was he doing up there? I forgot. I know he had to go to, I know he had to come up to Chicago area for court, but was it Lake County that he had to appear in court? No. He was scheduled to appear in court in Chicago, Lake County is just north of Chicago, so there was no record evidence. It's not just. I mean, it's north, and it takes a while to get there, traffic. It takes a long time. But I just wonder, what was he doing up there? The record is silent as to what he was doing up there, and I'm not in a position to say that. Yeah, I understand. I'm only asking what's in the record. Yeah. The state did its best to poke holes in the theory, in Patterson's theory, of these phone records. And you say it shows he's not where he said he was. So at this stage of the case, why should we credit Patterson's testimony over the other evidence at trial that the jury chose to believe instead? Well, Your Honor, because the jury had doubts about him being the principal. And so the jury said. They were instructed with this accountability instruction. They were, Your Honor. But the state never presented any evidence of an accomplice or a shared design or intent with an accomplice, which is what is required to convict under accountability theory. And had the jury, again, we're up here on an ineffective assistance of counsel claim. So had the jury heard the additional evidence that counsel failed to develop, again, that there were these other drug dealers who were out to get Prout and who had specifically spoken of killing you and throwing you in the trunk of your car and lighting it on fire, the jury would have known that those other drug dealers are entirely unconnected to Prout and couldn't have reached the conclusion that he was an accomplice with those other drug dealers. Let's unpack what the state had to prove with the accountability theory. You're saying that they had to prove an accomplice. The state didn't have to prove the identity of an accomplice, did it? No, Your Honor. It had to prove that there was a shared design or common intent with the accomplice. But there's no evidence of that. There's no evidence that Mr. Patterson shared a common design or intent. And the state hasn't offered a reason now. And under this court's decision in Fagan, which involved a gang shootout, the evidence there was even more strong. You had a gang member show up to avenge a gang-related violence and a shootout occurred and the court still said that there was insufficient evidence to prove the defendant guilty under an accomplice theory because there was no evidence that he fired the kill shot. There was no evidence that anyone he showed up with fired the kill shot. And here... The accomplished theory is just an add-on here. This is a direct liability case based on strong circumstantial evidence. It's really not an accomplice theory case. Well, respectfully, Your Honor, the jury asked about the accountability instruction. And the reason they did is because there was reason to doubt that Mr. Patterson was the principal. Again, there was circumstantial evidence, but there wasn't strong circumstantial evidence. There was, again, no evidence of motive, of a real motive. There was no evidence... It's evidence of motive. Right. There's no evidence of motive. You can challenge it, but there is plenty of evidence of motive and there's plenty of circumstantial evidence putting him at the scene of the events and the blood evidence is very powerful. Well, respectfully, I would disagree that there is evidence placing him at the scene of the crime. There's evidence that Prout's blood was found in Mr. Patterson's house, but there's not evidence that Mr. Patterson was there at the time. And there's not evidence that Prout was, in fact, killed on June 17th as a state positive at trial. The medical examiner testified that he could have been killed as late as June 21st. And so, there's lots of reasons to doubt the state's theory at trial. And now, in light of the new evidence that Mr. Patterson has presented, there's reason to... That any reasonable juror would have concluded that Mr. Patterson was not guilty beyond a reasonable doubt. Well, you're burdening here and we're not... We've been spending a lot of time talking about the merits of the underlying constitutional claims, but this is here on actual innocence review based on the untimeliness of the petition and that burden is higher. Correct, Your Honor. It is higher. Although, we do have an argument that the habeas petition was timely. But even if we're on an actual innocence theory, there's plenty of corroborating evidence. Again, multiple witnesses said that there were other drug dealers that were out to get Prout and we believe we satisfy the burden for actual innocence, even if the court disagrees with us on timeliness grounds. Well, that burden is more likely than not that no reasonable jury... Juror would find him guilty. Correct, Your Honor. But again, we know that the jury did have doubts about Mr. Patterson's guilt under a direct theory of liability. We don't know that. A question from the jury can't be given that kind of weight. Well, we can draw an inference from the jury's notes and that they were clearly thinking about the accountability instruction and they put... It's an objective inquiry. I understand. But you don't try to get into the heads of the jurors and entertain subjective inquiries. Correct, Your Honor. But again, in light of the evidence at trial being so circumstantial and not enough to convict Mr. Patterson under a direct theory of liability, and again, given that the state admits that Mr. Patterson likely had help and that someone else was there, there's reason to think that a reasonable jury would have been thinking about the accountability instruction. And again, in light of Mr. Patterson's new evidence that he was physically incapable of overpowering a man 80 pounds heavier than him... How does that matter with the accountability instruction again? If the accountability instruction leads to an inference that someone assisted Patterson, how does Patterson's inability to overpower Prout matter? It doesn't. That's under the direct theory. But again, because the state has presented no evidence that there was an accomplice or that Mr. Patterson shared a common design or intent with an accomplice, then if he's not guilty under a direct theory, then he must be guilty under an accomplice theory and there's no evidence of an accomplice. There's no evidence of a shared intent or design or common design. And if Your Honors have no further questions, I'll reserve the remainder of my time for rebuttal. Oh, that's fine. Thank you. Mr. Schneider. May it please the Court, Counsel, Assistant Attorney General Josh Schneider on behalf of the Respondent. This Court should affirm the judgment of the District Court because the petition is years untimely and petitioner has failed to bear his burden of proving that he is actually innocent as required to overcome that untimeliness. I'll start with the question of actual innocence. Unless the Court has questions, we'll rest on our brief on the question of untimeliness. As the Court noted, petitioner bears the burden of proving he is actually innocent. He needs to show new evidence that is sufficiently compelling that more likely than not, no reasonable juror would have found him guilty, notwithstanding all of the evidence at trial and additional new evidence, some of which is exculpatory, he argues, some of which is inculpatory. And he fails to bear this burden because the evidence that he's presented doesn't actually exonerate him. The evidence doesn't compellingly present a story of the crime being committed with petitioner not being involved. And a good example of this is that the thrust of petitioner's argument is that there are these second and third-hand rumors that unknown drug dealers, possibly from Indiana, possibly from California, that Prout owed money to these drug dealers and if he didn't pay them back, that they would kill him. But at most, this suggests that unknown drug dealers had a contingent motive, this unpaid debt, to kill Prout. Now, the police reports that contained those rumors also contained Prout's statements to But even if these rumors established that unknown dealers had a motive to kill Prout, that doesn't prove that petitioner didn't kill Prout. Because, of course, motive is not means and opportunity. And the real problem for petitioner here is that none of his evidence provides an innocent explanation for how it is that unknown drug dealers could have brought Prout to petitioner's home, killed Prout on petitioner's living room rug, tried to clean up the blood pool with cleaning products from petitioner's kitchen, and when that failed, removed petitioner's keepsakes from the walls, lit the house on fire, and then locked the doors behind them without petitioner being involved, either as a principal or as an accomplice. There's no sign of forced entry, the doors were all locked, the house was burned from the inside. There just is no explanation for how this could possibly have happened without petitioner having done it. And it is, of course, his burden to prove he is actually innocent. And of course, the rumors also cut both ways. In the same documents that provide these rumors of drug dealers being out to get petitioner, there is also, in those same documents, inculpatory rumors. Krista Prout told police that the word all over town was that Prout's disappearance was due to petitioner. Keith Prout had heard rumors that Prout never should have trusted petitioner and petitioner's brother, Reesey. So it is not particularly exculpatory, and it's not particularly reliable, turning to the evidence that petitioner was physically incapable of killing Prout. Of course, that is irrelevant to the question of accountability, but it also isn't terribly persuasive with respect to the direct liability question, because the actual evidence, the established physical incapability, it shows that he had had a twinge in his back earlier at work that had flared up. He came back to the hospital. He was given a muscle relaxant, a painkiller, Valium, and sent home with instructions to ice his back. And by his own testimony, the next day, on the 17th, he was sufficiently recuperated that he could drive to Candace Johnson's house to meet Prout. If he says that he bought 30 pounds of marijuana from Prout, that means he was able to lift 30 pounds of marijuana. He then says that he washed his car. The next day, he says that he drove to Chicago. So none of this is inconsistent with someone having the ability to lift a knife. Can I shift you to where we spend a lot of time with counsel, which is this accountability theory? In a case like this where the defendant is prosecuted under an accountability, but the the state needs to prove a common intent, an intent to kill Prout. And that can be established by circumstantial evidence. Simply being on the scene we know is not enough, as Fagan establishes. Simply being in the room when a crime takes place, absent other evidence, is insufficient. So there, the fact that someone was shot with a weapon that the defendant didn't have, that none of his group had, simply didn't tie him to that crime. But here, what the evidence shows is that Petitioner brought Prout to his home. The phone records established that the phone calls were through the cell tower near his home. He had arranged a drug deal that he didn't have the money to complete. It was a $16,000 drug buy, but he was behind on his rent. Now he says that's because the well water was bad, but Rivera's testimony of the grand jury also said they were behind on the rent, and she said they were behind on his rent. You're going back to motive. I'm trying to ask you about what is the scope of the common intent, common plan that you need to point to, and do you need to point to the identity of an accomplice? So you don't need to identify the accomplice. All you need to show is that you shared the intent to kill Prout. With who? With whomever it was. So if all we know is that there was someone in the house, let's say that the medical records actually did establish he was physically incapable of lifting a knife or pulling a trigger. The blood evidence establishes that Prout was killed in his home. So someone killed Prout in his home. If it wasn't Petitioner himself, all we would need is circumstantial evidence establishing that he shared that intent of whoever was in his home and stabbed Prout in the neck. So here that evidence would be that Prout was brought to his home. It would be that Prout was killed in his home. It would be the attempt to clean up the blood using cleaning products from his home. And the fact that the house was then burned by someone who had keys to the home because the door was locked afterwards. The timing of the house being burned down is also indicative of Petitioner having been involved in the murder and having shared the intent to kill Prout. What about the pictures being removed from the wall? That seemed awfully suspicious to me. Petitioner's pictures being removed from the wall was also strongly indicative that he was involved in the murder. Now there's an argument made that, well, he was moving and so he removed everything from the house, but that's inconsistent with his own story as to why he went to St. Louis. He said he went to St. Louis because they had lost everything. So it's inconsistent that he only took the pictures, left everything else in the house while moving, and then the house burned down. Is there any evidence in the record that he was not in St. Louis, June 21st and 22nd, when the car was set on fire up in Lake County? No, there's no evidence. But we would note that it is irrelevant to his guilt for murder, arson, or concealing a homicidal death. Whether he was involved in the car being set on fire. Now the phone records establish that the day after the house was burned, his phone went up to the little isolated area in the border of Cook and Lake County where the body was ultimately found in the trunk of the car. And of course it was found wrapped in the blanket from his home, the body. But whether he was in St. Louis, we don't dispute he was in St. Louis on the 22nd, but there's no question that Prout was killed before he was found in that field because his body was already decomposing as evidenced by decomposition in the organs and brain. The exact time couldn't be established. We concede that because of course the damage from the fire in the trunk made that impossible, but he'd been dead for some time. And the gunshots that were fired into his head, into his face and the back of the head, were fired moments after he'd been stabbed. Because they were fired after his heart stopped, but possibly before he was brain dead. Which is a very narrow window. So that would have been sometime between 8pm on June 17th, when he was last seen alive with Petitioner leaving Candace Johnson's house, and 3am on June 19th when the house burned down, dropping the fire debris on top of the pool of blood. Let's shift to ineffective assistance of counsel then. What are we to make of trial counsel's statements that there were leads he just didn't follow up on because he assumed Patterson was guilty? Is there a point where a lawyer's failures become so egregious that we have to find prejudice? So if the prejudice standard is satisfied, certainly now it's important to remember that the basis for the ineffective assistance claim, this is reviewed under 2254D in the deferential standard that's applied to the state court's judgment. So we have to be careful which basis we're talking about. But broadly, if we're talking about his not investigating... I'll say one more thing before getting into it. We also need to remember there's a strong presumption of competence. So in the face of a silent record about the extent of counsel's investigations, we can't presume that he did not engage in a particular investigation. So with respect to the rumors about unknown drug dealers having a motive to kill Prout, counsel explained that he didn't investigate those because he spoke to the same people who spoke to police. He spoke to Keith Prout. I believe he said he spoke to Keith Prout. But we know that he spoke with Krista Prout about those rumors. And he read the police reports and he said, there's nothing in these reports that would be admissible at trial. All of this is hearsay upon hearsay. And so his decision that I'm not going to investigate these rumors of unknown drug dealers who may have had a motive is not objectively unreasonable. And certainly not under 2254D so unreasonable that no rational jurist could have agreed with the state court's finding that it was not objectively unreasonable. With respect to the alleged limitations of his investigations of petitioners' whereabouts in Chicago and St. Louis, the record really doesn't support any clear limitation on those. There was some questioning of the investigator at the post-conviction hearing, but it was limited to, he wasn't asked what other investigations he did. There were some sort of pointed questions about his investigation of the Rand Motel and his follow-up with the body shop employee who said that he thought he'd seen an African-American man driving a blazer around that time. But he wasn't asked what else he had done, who else he had called. Similarly, he said that the counsel instructed him to investigate petitioners' alibi in Chicago and in St. Louis. But my recollection of the record is that there was no specific questioning on any of those additional investigations that may have taken place. It was a fairly focused examination at the post-conviction evidentiary hearing. Similarly, with respect to the St. Louis alibi, that he was in St. Louis when the body was found, counsel said that he had instructed the investigator to investigate that. The investigator said that he had contacted the hotel down there where the petitioner had stayed.  The police had already subpoenaed all the relevant records and if there was surveillance footage, that footage. And there simply weren't any other questions about what he did or didn't do down there. So there's no basis for us to conclude that he would have found anything that would have been exculpatory such that had it been presented, there's a reasonable probability that the petitioner would have been acquitted or that the state courts in finding that he had failed to bear that burden were objectively unreasonable in reaching that conclusion. But of course, to reach that question, which the district court had no opportunity to reach, we'd have to get past this untimeliness bar and the petitioner would have to establish actual innocence. The last point I guess I would make is returning to the evidence of actual innocence that the petitioner has put forth. This argument about being in St. Louis when the body was found simply doesn't matter again. It wasn't the basis of any of the charges. And the state of the body established that it had been killed sometime earlier. And so regardless of whether someone thought they heard gunshots in the fire department, testimony was that explosions, popping sounds, cracking sounds was entirely consistent with a car being on fire. Thomas Lusich testified he heard four or five thumps that morning. That's what caused him to look out the window and see the car. That would not have provided an innocent explanation for why Prout had left a substantial pool of his blood in the petitioner's living room sometime between 8 p.m. on the 17th and 3 a.m. on the 19th. So unless the court has any further questions, we'd ask that the court affirm the judgment in the district court. Thank you. Ms. Phillipi. Thank you, Your Honors. Just three quick points on rebuttal. First, the state just acknowledged that there needed to be evidence of a common designer intent. And under this court's precedent in Blackmun, and the state talked a lot about that evidence because Prout's blood was found at the house. But under this court's precedent in Blackmun, merely providing the auspicious opportunity to commit the offense isn't enough to convict someone under an accountability theory. Second, with respect to counsel's deficient performance and whether it prejudiced Mr. Patterson, it did, and his performance was deficient and the errors were so egregious. The trial court found that it was readily evident from the record that trial counsel did not perform to a sufficient standard. And the record wasn't silent that trial counsel failed to investigate. He said he failed to investigate. He said he read the police reports and then didn't think that it would lead to any evidence. He just simply didn't engage. But under this court's precedent in Blackmun, an outright failure to investigate witnesses is a sign of deficient performance. Third, with respect to timeliness, Illinois has a practice of accepting late PLA petitions and giving them to the court for consideration. This court follows state court practices with respect to whether a federal habeas petition is timely. And as a policy matter, that makes sense because we want state courts to address these habeas claims in the first instance before a petitioner, or post-conviction claims in the first instance before a petitioner files a federal habeas claim. So for all those reasons, we respectfully request that this court reverse the district court. Thank you. Our thanks to both counsel. The case is taken under advisement.